**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| MS DISTRIBUTORS LLC,<br><br>**Plaintiff,**<br><br>v.<br><br>SYNERGY FACTORY LLC (Florida); SYNERGY FACTORY LLC (Puerto Rico); BOULEVARD GARAGE AUTO SERVICE & Q-LUBE LLC; JOSE LUIS IRIZARRY ALCOVER; OSVALDO O. FRIGER SALGUEIRO; JOSE LUIS RODRÍGUEZ-CENTENO; YVONNE GISSELLE-OTERO; and the MARITAL PROPERTY REGIME RODRÍGUEZ-OTERO.<br><br>**Defendants.** | CIVIL NO. 25-1108 (RAM) |

**OPINION AND ORDER**

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court is Plaintiff MS Distributors LLC's ("Plaintiff" or "MS Distributors") request for preliminary injunctive relief under federal and Puerto Rico law. (Docket Nos. 2 and 3). For the reasons set out below, MS distributor's request for preliminary injunction is **DENIED**.

## I. PROCEDURAL BACKGROUND

On February 19, 2025, Plaintiff filed its *Verified Complaint* and *Verified Memorandum of Law in Support of Verified Complaint & Remedies Requested Therein* ("*Memorandum of Law*"). (Docket Nos. 2 and 3, respectively). Plaintiff claims that co-defendant Jose Luis Rodríguez-Centeno ("Mr. Rodríguez"), a former employee,

misappropriated MS Distributor's trade secrets, namely its "product formulas and manufacturing process for various automobile care products," and improperly disclosed them to co-defendants Jose Luis Irizarry-Alcover ("Mr. Irizarry"), Osvaldo Friger-Salgueiro ("Mr. Friger"), Synergy Factory LLC (Puerto Rico) ("Synergy PR"), Synergy Factory LLC (Florida) ("Synergy FL") (jointly referred as "Synergy Factory"), and Boulevard Garage Auto Service & O-Lube LLC ("Boulevard Garage") (collectively with Mr. Rodríguez, "Defendants"). (Docket No. 3 at 2). Plaintiff further contends "[t]he misappropriated trade secrets allowed Defendants to manufacture a line of products for automotive cleaning and maintenance, that they did not produce before." Id. at 3. Accordingly, MS Distributors requests injunctive relief ordering Defendants to cease from using and/or disclosing Plaintiff's trade secrets (including selling or manufacturing products allegedly using Plaintiff's trade secrets), pursuant to the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. §§ 1836, *et seq.*, and the Industrial and Trade Secret Protection Act of Puerto Rico, Law No. 80 of June 3, 2011, as amended, ("ITSPA"), P.R. Laws. Ann. Tit. 10 §§ 4131, *et seq*. Id. at 24-26 and 27-30.

The Court held a four-day preliminary injunction hearing. (Docket Nos. 80, 87, 115 and 117). During the hearing, Plaintiff presented the testimony of Miguel Sánchez, the president and owner

of MS Distributors, and Alexis J. Torres-Irizarry, an expert witness, on its behalf. Id.

## II.   LEGAL STANDARD

### A. Defining and Protecting Trade Secrets

The DTSA and ITSPA provide protections "for individuals and entities claiming misappropriation of their trade secrets." Allstate Ins. Co. v. Fougere, 79 F.4th 172, 187 (1st Cir. 2023).

The DTSA defines a trade secret as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, **formulas**, designs, prototypes, methods, techniques, **processes**, **procedures**, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) **the owner thereof has taken reasonable measures to keep such information secret**; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and **not being readily ascertainable through proper means** by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3) (emphasis added). Although this definition is broad, when raising a DTSA claim, "a plaintiff must 'adequate[ly]' describe the asserted trade secrets 'with clarity that can be understood by a lay person'" and with sufficient specificity.

Insulet Corp. v. EOFlow Co., 755 F. Supp. 3d 70, 89 (D. Mass. 2024), motion to certify appeal denied, No. CV 23-11780-FDS, 2024 WL 5442419 (D. Mass. Nov. 1, 2024) (quoting Neural Magic, Inc. v. Meta Platforms, Inc., 659 F. Supp. 3d 138, 166-7 (D. Mass. 2023)).

On its part, the ITSPA, which is based on the Uniform Trade Secrets Act, defines trade secrets to be any information that:

> (a)  That has a present or a potential independent financial value or that provides a business advantage, insofar as such information is not common knowledge or readily accessible through proper means by persons who could make a monetary profit from the use or disclosure of such information, and
>
> (b) for which reasonable security measures have been taken, as circumstances dictate, to maintain its confidentiality.

TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo, 966 F.3d 46, 52 (1st Cir. 2020) (quoting P.R. Laws Ann. tit. 10, § 4132).

Generally, a trade secret is "misappropriated" if it is acquired or disclosed by improper means. *See* 18 U.S.C. § 1839(5). Per the DTSA, improper means "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" and "does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6). Notably, although the "Puerto Rico Supreme Court has not further illuminated the elements for proving trade secret misappropriation... the Puerto Rico Supreme Court generally looks

at the law of other jurisdictions that have adopted a uniform act when interpreting Commonwealth law that was modeled after the same uniform act." TLS Mgmt. & Mktg. Servs., 966 F.3d at 52.

Because the definitions under the DTSA are substantially similar to those under the ITSPA, the Court shall revise both statutes in tandem. *See* P.R. Laws. Ann. Tit. 10 §§ 4131-4132.

## B. The Preliminary Injunction Standard

Fed. R. Civ. P. 65(a) authorizes courts to issue preliminary injunctions upon notice to the adverse party. When faced with a motion for a preliminary injunction, district courts must assess the following four elements:

> (1) the likelihood of success on the merits;
> (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004) (quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996)); *see also* NuVasive, Inc. v. Day, 954 F.3d 439, 443 (1st Cir. 2020) (quoting Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)). Both the DTSA and ITSPA explicitly provide that courts may issue injunctive relief to protect trade secrets from misappropriation. *See* 18 U.S.C § 1836(b)(3)(A); P.R. Laws. Ann. Tit. 10 § 4136.

Notably, the ITSPA provides that "cases in which it is proven that an industrial or trade secret has been misappropriated, the court may issue a preliminary injunction order, for which the plaintiff shall not be under the obligation to prove irreparable damages." P.R. Laws. Ann. Tit. 10 § 4136. Nevertheless, per the text of the statute, the party seeking injunctive relief must establish that a trade secret has been misappropriated, which is analogous to likelihood of success on the merits.

### III. FINDINGS OF FACT

Fed. R. Civ. P. 52(a) requires that courts state the findings that support its decision in granting or refusing an interlocutory injunction. Having analyzed the relevant pleadings on the docket and the evidence presented at the Preliminary Injunction Hearing, the Court makes the following findings of fact:[1]

**A. MS Distributors**

1. Miguel Sánchez ("Mr. Sánchez") is the President and owner of MS Distributors, a limited liability company organized under the laws of Puerto Rico on April 30, 2014.

2. MS Distributors represents and distributes automobile product lines from all over the world, manufactures its own automobile products, and provides services to car dealerships in Puerto Rico.

---

[1] References to a specific Finding of Fact shall be cited in the following manner: (Fact ¶ _).

3. MS Distributors realized that there was a market in Puerto Rico for products like those in the Pro Car Beauty line it represented but at a lower price point.

**B. Developing Formulas and Manufacturing Products**

4. MS Distributors began to manufacture its own products under the registered trademark label AMS Industrial Solutions ("AMS").

5. The first product manufactured by MS Distributors was Tire Dressing. MS Distributors purchased the formula from Patricio Morales and initiated production. The label for this product was "Magic Shine".

6. Mr. Sánchez was interested in producing more products, specifically a pH balanced car wash formula and two coolant formulas.

7. Mr. Sánchez contacted Jose Luis Rodríguez ("Mr. Rodríguez"), an individual engaged in selling formulas, to help him with the formulas.

8. On May 10, 2016, Mr. Rodríguez provided Mr. Sánchez with a Service Proposal Agreement for the acquisition of formulas whereby Mr. Rodríguez committed to provide formulas for car shampoo, coolant 50, and coolant 33, as well as instructions and support with mixing the formulas, in exchange for $4,000.00 from MS Distributors.

9. Mr. Rodríguez and Mr. Sánchez signed the agreement.

10. Per the terms of the Service Proposal Agreement, the parties also agreed to sign a confidentiality agreement to "protect the integrity and confidentiality of our agreements," but there is no evidence that a confidentiality agreement was executed.

11. The Service Proposal Agreement did not specify that the formulas would be exclusively made for MS Distributors could not be sold to other manufacturers.

12. MS Distributors did not enter a non-compete agreement with Mr. Rodríguez.

13. MS Distributors did not have a nondisclosure agreement signed by Mr. Rodríguez nor did it provide Mr. Rodríguez with any manuals, protocols or rules regarding the handling of formulas or trade secrets.

14. Mr. Rodríguez provided the formulas agreed upon and MS Distributors began manufacturing them.

15. Mr. Sánchez subsequently asked Mr. Rodríguez to work with MS Distributors to develop new products.

16. Mr. Sánchez testified that as Mr. Rodríguez provided support with chemical products, he integrated himself into MS Distributors and eventually became an employee in 2018. Specifically, Mr. Rodríguez began as a salesman for MS Distributors and later became the company's general manager.

17. Mr. Sánchez wanted to make an iron remover product like the one in the Pro Car Beauty line and asked Mr. Rodríguez to help him develop it.

18. At Mr. Rodríguez's request, Mr. Sánchez got the Pro Car Beauty Safety Data Sheet ("SDS").

19. The SDS indicates the different components of a given product, the active ingredients, safety elements, and what to do in case of an emergency. SDSs are publicly available, and therefore anyone with internet access can search the SDS of Pro Car Beauty products.

20. Mr. Sánchez and Mr. Rodríguez contacted Evans, the German company that produces a raw material that is used in the Pro Car Beauty formula. They told Evans that they were interested in producing an iron removal material but did not know how to go about it.

21. Evans provided them with the formula as well as information needed to manufacture it, and MS Distributors made its first purchase from Evans.

22. Even with the formula, modifications needed to be made for it to achieve the desired result. Mr. Sánchez provided Mr. Rodríguez with feedback so that he could make necessary adjustments until the formula worked just like the Pro Car Beauty product. Specifically, they had to add more of a particular product.

23. The iron remover developed through this process was sold as AMS Industrial Solutions Iron Remover.

24. Mr. Sánchez testified that the Iron Remover formula is difficult to make because it is hard to access the necessary raw materials in Puerto Rico as they are made outside of the United States.

25. Mr. Sánchez testified that MS Distributors is using Pro Car Beauty's formula for iron remover.

26. Mr. Sánchez testified that the formula belongs to MS Distributors because Evans provided it to them. However, Mr. Sánchez does not know if Evans shared the formula with any other entity besides MS Distributors.

27. Mr. Sánchez distributed the Pro Car Beauty product called clear Rubber Dressing, a water-based product that is diluted.

28. The competition in Puerto Rico only sold a non-diluted product. A dilutable product is much more cost effective.

29. Mr. Rodríguez started to work on developing a formula but was unable to get it quite right.

30. Mr. Sánchez suggested calling Capco, the company that sells the raw materials for assistance. Capco suggested adding a thickener.

31. Mr. Sánchez and Mr. Rodríguez continued to add the thickener until they achieved a product that was dilutable 3 to 1. This product was sold as AMS Industrial Solutions Flushing.

32. Mr. Rodríguez proposed making more cost-effective versions of Pro Car Beauty degreaser and multi-use cleaner formulas that MS Distributors distributed.

33. Mr. Sánchez and Rodríguez developed a diluted degreaser using the HydroMinder system, as specified by the manufacturer. The diluted degreaser was cheaper, didn't ruin the vehicles surface, and would not cause bad reactions on the skin. This product was sold as AMS Industrial Solutions Industrial Degreaser.

34. Mr. Rodríguez also helped develop a multi-purpose cleaning product, sold as AMS Industrial Solutions Multi-Purpose Cleaner.

35. To protect MS Distributor's formulas, Mr. Sánchez limited the number of people with access to them, kept the formulas in a file under lock and key, and saved them in a password protected a computer.

36. However, the documents containing the formulas were not labeled as confidential.

37. Only four people had access to the formulas, namely: Mr. Sánchez, Mr. Rodríguez, Anna Acosta (an administrator), and Felix Guzman (the individual who mixes the products).

38. Mr. Sánchez protected these formulas because they are the "heart of the company."

39. By developing products locally, MS Distributors had an advantage in the market because it was able to offer more competitive pricing for its products and always had inventory available in Puerto Rico whereas other local distributors had to import products from other countries.

## C. Synergy Factory

40. Synergy Factory is a company that began manufacturing similar products in 2021. Their main products were car wash, degreaser, and iron remover.

41. Auto Complete, a mechanic shop owned by Synergy Factory, was a client of MS Distributors that purchased the products MS Distributors manufactured. Their last purchase of AMS Industrial Solutions products from MS Distributors was on January 25, 2021.

42. Synergy Factory and Auto Complete are owned by Mr. Jose Luis Irizarry-Alcover ("Mr. Irizarry"), who also serves as the president of both companies.

43. Mr. Sánchez testified that Auto Complete and Synergy Factory operated as if they were the same company. For example, Auto Complete would issue checks to pay for Synergy Factory's outstanding MS Distributors invoices.

**D. The Pen Drive and its Contents**

44. On February 23, 2022, Mr. Sánchez discovered a pen drive inserted into Mr. Rodríguez's computer at MS Distributors with several documents saved on it.

45. Specifically, the pen drive had a folder titled "AUTOCOMPLETE" containing formulas as to several car cleaning products including degreaser, car wash, iron remover, tire shine, flushing, and multi-purpose cleaner.

46. In addition to the formulas, the pen drive had worksheets and cost sheets that assist with the manufacturing of said products, mixing procedures, details of fees, SDSs, invoices, proposals, and a confidentiality agreement, among other documents.

47. The pen drive had two documents titled "Synergy Factory Proposal Letter" with two different dates.

48. The Synergy Factory Proposal Letter dated January 28, 2021 is signed by Mr. Rodríguez and addressed to Mr. Irizarry, the owner of Synergy Factory and Auto Complete. Therein, Mr. Rodríguez proposed his chemical products consulting services that would allow Mr. Irizarry to acquire three formulas for automotive cleaning chemical products from Mr. Rodriguez, along with consulting, mixing procedures and technical support, in exchange for $2,700.00 per formula for a total of $8,100.00. The three formulas considered in the proposal were

Car Wash, Degreaser, and Iron Remover. The proposal in the pen drive does not have Mr. Irizarry's signature.

49. The Synergy Factory Proposal Letter dated October 4, 2021 was also signed by Mr. Rodríguez and addressed to Mr. Irizarry. Therein, Mr. Rodríguez proposed his chemical products consulting services that would similarly allow Mr. Irizarry to acquire five formulas for automotive cleaning chemicals, specifically Water spot remover, Multipurpose, Flushing, Tire shine, and Erase Prep. Mr. Irizarry would obtain the formulas, as well as documents necessary to manufacture them, consulting and support in exchange for $2,000.00 per formula for a total of $10,000.00.

50. Notably, MS Distributors also manufactures Car Wash, Iron Remover, Degreaser, Multipurpose cleaner, Flushing and Tire Shiner.

51. The pen drive also contained a Confidentiality Agreement dated January 30, 2021, executed by Mr. Rodríguez and Mr. Irizarry whereby the parties agree to not disclose the acquired formulas or work relationship between the two.

52. Mr. Sánchez concluded that the formulas found in the AUTOCOMPLETE folder of the pen drive belong to Synergy Factory, the company that owns Auto Complete.

**E. Mr. Rodríguez's Employment after the Pen Drive was Found**

53. The day after finding the pen drive, Mr. Sánchez gave Mr. Rodríguez a copy of the proposal letter, fired him and had Mr. Rodríguez remove everything from the company vehicle he used.

54. On March 2, 2022, Mr. Sánchez, on behalf of MS Distributors sent Mr. Rodríguez a formal dismissal letter.

55. Mr. Rodríguez subsequently sent a letter to Mr. Sánchez and MS Distributors requesting the return of his pen drive.

56. After his termination, Mr. Rodríguez began to work with Synergy Factory.

**F. Comparing Formulas and the Manufacturing of Products**

57. Mr. Sánchez testified that the formula for Iron Remover found on the pen drive is the same as MS Distributors.

58. Mr. Sánchez noted that although they appear to require different quantities of the ingredients, that is because the MS Distributor formula makes 220 gallons whereas the Synergy Factory formula makes 100 gallons. Mr. Sánchez converted each quantity to demonstrate his point.

59. Mr. Sánchez noted that the formula for Flushing found in the pen drive uses the same components in similar amounts in comparison to the MS Distributors formula for Flushing.

60. Mr. Sánchez testified that the formula for Multi-use found in the pen drive is similar to MS Distributors' formula for Multi-purpose cleaner

61. Synergy Factory's website, synergyfactoryllc.com, contains a catalogue listing products manufactured in Synergy Factory LLC. Specifically, the website states that Synergy Factory manufactures the following general car care products: degreaser, multipurpose cleaner, pH balance shampoo, premium dressing, tire shine, surface prep, and iron remover.

62. Except for surface prep, MS Distributors manufactures the same products.

63. Per their website, Synergy Factory manufactures car care products and offers private label solutions for clients who require customized products under their brand name.

64. One of Synergy Factory's collections of products is the DeadDog Crew product line. This product line consists of DeadDog pH Balanced Shampoo, DeadDog Tire Shine, DeadDog Degreaser, DeadDog pH Balanced Iron Remover; DeadDog Premium Dressing; DeadDog Crew 4-in-1 Ceramic Was, DeadDog Multi-Purpose Car Cleaner, and DeadDog Surface Prep

65. Mr. Sánchez testified that since Synergy Factory began manufacturing products with MS Distributor's formulas, MS Distributors has lost business and has not been able to expand as previously planned. Additionally, it has caused confusion

in the market as well as emotional damages to Mr. Sánchez personally.

66. Mr. Sánchez also testified that Synergy Factory is now making formulas with a cheaper brand called Car Wash Cash Wars at a lower price point with which MS Distributors cannot compete.

67. MS Distributors has not conducted expert analysis to determine how similar Synergy Factory's products are to MS Distributors nor to determine whether Synergy Factory's products were made using the same formula.

68. Sánchez testified that he does not have personal knowledge that Synergy Factory was using MS Distributors' formulas.

## IV.  DISCUSSION

The "likelihood of success" factor "is 'the touchstone of the preliminary injunction inquiry.'" Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008) (quoting Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998)). If likelihood cannot be demonstrated by the moving party, "the remaining factors become matters of idle curiosity." Id. (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)). To establish likelihood of success under the DTSA, the plaintiff must show "1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire and

use the trade secret." _Incase Inc. v. Timex Corp._, 488 F.3d 46, 52
(1st Cir. 2007)); Moreover, "the trade secret owner has the burden
of proof to establish the existence and scope of the alleged trade
secret in the litigation.". _TLS Mgmt. & Mktg. Servs._, 966 F.3d at
52.

In its _Memorandum of Law_, MS Distributors posits that the
formulas and manufacturing processes for the following products
constitute its trade secrets: AMS Industrial Solutions Car Wash;
AMS Industrial Solutions Coolant 33%; AMS Industrial Solutions
Coolant 50; AMS Industrial Solutions Flushing; AMS Industrial
Solutions Degreaser; AMS Industrial Solutions Multi-Purpose
Cleaner; AMS Industrial Solutions Iron Remover; and AMS Industrial
Solutions Magic Shine Tire Dressing. (Docket No. 3 at 13). The
_Memorandum of Law_ merely states in a conclusory fashion that the
formulas and manufacturing processes for said products are trade
secrets without alleging how they comply with the statutory
definitions. As discussed above, a formula or process constitutes
a trade secret if: (1) it presents actual or potential economic
value to its owner because it is not generally known or readably
ascertainable; and (2) its owner takes reasonable measures to
ensure that the information remains confidential. _See_ 18 U.S.C. §
1839(3); P.R. Laws Ann. tit. 10, § 4132.

At the Preliminary Injunction hearing, MS Distributors
supplemented the record with Mr. Sánchez's testimony as to the

nature, value, and protection of these alleged trade secrets. As a threshold matter, it is worth noting that Mr. Sánchez testified that all formulas and procedures were protected by the same security measures namely: they were filed under lock and key, saved in password protected computer, and only four employees had access to them. (Facts ¶¶ 35, 37). None of the formulas were labeled as confidential nor were they the subject of confidentiality agreements. (Facts ¶¶ 10, 36). Although there was certainly room for improvement, the court finds that MS Distributors did take reasonable security measures to maintain the confidentiality of its alleged trade secrets. Thus, the question becomes whether MS Distributor's purported trade secrets consist of information that is not commonly known or readily ascertainable through proper means. From Mr. Sánchez's testimony, it is evident that formulas and manufacturing processes for the aforementioned products fall into two camps: (a) those purchased and acquired by MS Distributors from third parties; and (b) those developed by MS Distributors. The Court will analyze both groups separately below.

## A. Acquired Formulas and Manufacturing Processes

Per Mr. Sánchez's testimony, MS Distributors purchased its formula for tire dressing, sold as Magic Shine, from Patricio Morales. (Fact ¶ 5). No testimony or evidence was provided to establish that the formula was sold exclusively to MS Distributors. Therefore, the record does not establish that the formula for tire

dressing was not readily accessible from Patricio Morales by others seeking to generate their own economic value from its use.

Similarly, MS Distributors entered into a Service Proposal Agreement with Mr. Rodríguez to acquire formulas and manufacturing procedures for Car Shampoo, Coolant 50 and Coolant 33. (Fact ¶ 8). Per the terms of the Service Proposal Agreement the parties also agreed to sign a confidentiality agreement to "protect the integrity and confidentiality of our agreements" but crucially, a confidentiality agreement, nor an analogous non-compete agreement, was executed by the parties. (Facts ¶ 10, 12). Moreover, the Service Proposal Agreement is silent as to the confidentiality and exclusivity of the formulas and manufacturing processes outlined therein. (Fact ¶ 10). As with the Magic Shine Tire Dressing, Plaintiff has not met its burden of showing that the formulas and manufacturing processes for AMS Industrial Solutions Coolant 33%; AMS Industrial Solutions Coolant 50% and AMS Industrial Solutions Car Wash are not readily ascertainable by others for their own financial gain.

### B. Formulas and Manufacturing Processes Developed by MS Distributors

With regards to the Iron Remover, Flushing, Degreaser, and Multi-Use. Mr. Sánchez testified how he and Mr. Rodríguez sought to recreate products akin to those manufactured by Pro Car Beauty. (Facts ¶¶ 17-33). In essence, they would first obtain the publicly

available SDSs to identify the active ingredients of existing products and subsequently contact manufacturers of said active ingredients for guidance regarding how to achieve the desired formulation. (Facts ¶¶ 18-21; 30-31; 33). In one instance, the manufacturer Evans even provided them with the formula for Iron Remover. (Facts ¶¶ 20-21).

From this testimony, the Court concludes that MS Distributors developed its formulas for Iron Remover, Flushing, Degreaser and Multi-Use by obtaining readily ascertainable information and reverse engineering, *i.e.*, "by starting with the known product and working backward to divine the process which aided in its development or manufacture." Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 476 (1974). Courts have found that products which have been reverse engineered cannot be protected as trade secrets. *See* Talon Indus., LLC v. Rolled Metal Prods., Inc., No. CV 15-4103 (CCC), 2022 WL 3754800, at *11 (D.N.J. Aug. 30, 2022) (citing Hammock by Hammock v. Hoffmann-LaRoche, Inc., 662 A.2d 546, 560 (N.J. 1995)); SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1255 (3d Cir. 1985)("Matters which are fully disclosed by a marketed product and are susceptible to "reverse engineering" ... cannot be protected as trade secrets."); Insulet Corp. v. EOFlow, Co., 104 F.4th 873, 882 (Fed. Cir. 2024) ("To be clear: if information is "readily ascertainable through proper means" such as reverse engineering, it is not eligible for trade secret

protection."). Although Mr. Sánchez testified regarding specific qualities he wanted for the products he was developing, they were crucially properties that mimicked those already exhibited by the Pro Car Beauty products he was seeking to emulate. MS Distributors gained an economic advantage, not by developing unique products, but by essentially replicating Pro Car Beauty products locally to sell at a more competitive price point. (Fact ¶ 39). *See e.g.*, Mallet & Co. Inc. v. Lacayo, 16 F.4th 364, 384 (3d Cir. 2021)(finding that plaintiff Mallet did not establish the existence of a trade secret in part because it did not "describe any characteristics or properties contributing specific competitive value to Mallet that could serve as a marker for separating Mallet's formulas from publicly available information or generally known formulas in the industry.").

Nevertheless, if the reverse engineering was "lengthy and expensive, a person who discovers the trade secret through reverse engineering can have a trade secret in the information obtained from reverse engineering." Mattel, Inc. v. MGA Ent., Inc., 782 F. Supp. 2d 911, 972 (C.D. Cal. 2011); *see also* Talon, 2022 WL 3754800, at *11 ("In determining whether a product can be reversed engineered, a court should consider the difficulty of reproduction, the amount of time it takes to reproduce the product, and the cost of developing the product."). The record reflects that the SDSs of existing products are publicly available and that

manufacturers of the active ingredients specified therein freely provided guidance regarding how to replicate formulas and in one instance the formula itself. *See* <u>Mallet</u>, 16 F.4th at 387 ("It is the trade secret owner that bears the burden of demonstrating its claimed secrets are protectable and are not general industry knowledge."). Mr. Sánchez testified that with the benefit of guidance from manufacturers, he would have Mr. Rodríguez add ingredients until the desired result was achieved. (Facts ¶¶ 22, 31, 33). He did not provide specifics regarding how MS Distributors developed the manufacturing processes for each product, nor the related costs and time investments required to do so. Instead, Mr. Sánchez described the manufacturing process in general terms and merely testified as to the difficulty related to developing one product: Iron Remover. Specifically, he explained that the Iron Remover was difficult to make because it required accessing raw materials made outside of the United States that are hard to find in Puerto Rico. (Fact ¶ 24). The record remains silent as to the difficulty, cost, and time investment required to create the formulas and manufacturing processes for the other products developed by MS Distributors. In the absence of this information, the Court finds that Plaintiff has not established that its formulas and manufacturing processes for Iron Remover, Flushing, Degreaser, and Multi-Use are trade secrets.

Civil No. 25-1108(RAM)                                                    24

## V.    CONCLUSION

"A preliminary injunction is an extraordinary and drastic
remedy that is never awarded as of right." Peoples Fed. Sav. Bank
v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012) (citations
and quotations omitted). Because Plaintiff has not shown the
existence of a trade secret at this stage, it cannot establish the
likelihood of success on the merits required for injunctive relief.
Accordingly, the Court hereby **DENIES** Plaintiff's request for a
preliminary injunction. A scheduling order shall issue.

**IT IS SO ORDERED.**

In San Juan Puerto Rico, this 7th day of January 2026.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge